SMITH v. HYNE.

1. MASTER AND SERVANT—DEATH — NEGLIGENCE — COMPETENCY OF MAN IN CHARGE OF SAWMILL.

    In an action for the death of plaintiff's decedent in a sawmill accident, where the only testimony touching the competency of the man in charge was that he was a competent and careful man, there was no issue on that question for the jury.

2. SAME—SUFFICIENCY OF CREW IN CHARGE OF SAWMILL.

Evidence in support of plaintiff's contention that the crew in charge of the sawmill was insufficient, *held*, insufficient to go to the jury.

3. SAME—SAFE PLACE TO WORK—LEAVING SAFE PLACE CONTRARY TO ORDERS.

Plaintiff's contention that deceased was not furnished a safe place in which to work, *held*, not supported by the record, where the evidence shows that he was engaged as a setter in a safe place, but that unexpectedly and contrary to orders he left his position for that of tail sawyer and in attempting to return by crossing the carriage fell and was killed.

4. SAME—WORKMEN'S COMPENSATION ACT, DEFENSES NOT AVAILABLE WHERE MASTER NOT UNDER.

Where defendant employer had not come under the workmen's compensation act, the common-law defenses of assumption of risk, negligence of fellow-servant, and contributory negligence of the injured employee were not available under 2 Comp. Laws 1915, § 5423, unless such contributory negligence was willful.

5. SAME—EVIDENCE—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

In the absence of evidence of negligence on the part of the employer, the kind or degree of the employee's negligence is immaterial.

6. SAME—EVIDENCE—SUFFICIENCY.

In such action, evidence *held*, insufficient to establish actionable negligence on the part of the employer.

Error to Livingston; Collins (Joseph H.), J. Submitted October 15, 1919. (Docket No. 47.) Decided December 22, 1919.

Case by Elmer L. Smith, administrator of the estate of Arthur H. Smith, deceased, against Fred T. Hyne for the alleged negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*W. P. Van Winkle & Son,* for appellant.

*Louis E. Howlett,* for appellee.

STEERE, J. On March 25, 1918, Arthur H. Smith, plaintiff's intestate, was instantly killed by a circular saw in front of which he fell while working as a setter in a small sawmill operated by defendant's employees in the township of Brighton, Livingston county. Deceased was a married man 59 years of age living in the village of Brighton, his occupation being varied. At times he worked at painting and carpentering and at times did various other kinds of work at odd jobs as he found employment. Defendant lived in the village of Brighton where he had been engaged for many years as a dealer in grain, produce, building material, etc., in partnership with his son. He owned and ran a large farm about four miles from the village, and with a nephew had for years owned a small sawmill located on his brother's farm about a mile from the main buildings on his farm. This mill was in a rough frame building some 50 feet long and 24 feet wide, in an open field five or six rods back from an easterly and westerly highway. It was only operated occasionally, at such times as they might wish to saw out some lumber, posts or other materials for their own use. In some years it was not operated at all and in others considerable sawing was done. A barn had burned on defendant's farm which he proposed to replace and preparatory to so doing had during the winter cut logs from a wood lot of his farm and hauled them to the mill to be sawed into timber and lumber for use in the construction of the barn.

Smith, the deceased, had done work for defendant at various times and for some days prior to the starting of this mill was working on defendant's farm trimming trees and other odd jobs, among which was fixing some windows in the mill at the instance of defendant's son, Erwin Hyne, who was in charge of preparing the mill for sawing and subsequently ran it as head sawyer. He was a man some 32 years old

who had worked in and run this mill from time to time on previous occasions when it was in operation. He asked Smith if he had ever worked in a sawmill, to which he replied he had a good many years ago when a boy. He was told when the mill would start and on that day appeared with his dinner pail ready to work. Erwin Hyne in arranging his crew told Smith he wanted a setter and explained to him the duties of a setter in connection with the appliances to be used. Smith accepted the position, readily understood and efficiently performed his duties until the accident on March 25th.

The mill started sawing on March 21, 1918. It was a small, simple mill, operated by a crew of four men, consisting of Erwin Hyne as head sawyer, William Standlick as engineer, his brother, Charles Standlick, as tail sawyer, and Smith, the deceased, as setter. A traction engine furnished the power which was transmitted to the mechanism of the saw by a belt. The single circular saw was 50 inches in diameter, located in the east end of the mill, with the engine in the west end. The logs to be sawed were piled outside at the easterly end of the building which was open, allowing the carriage track to extend out some distance beyond. The carriage was located on an iron track at the north side of the saw. The track extended more than the length of the carriage beyond the east end of the building and into the building some 20 feet west of and beyond the saw. The carriage ran back and forth along the track on four wheels, its movements controlled by levers manipulated by the head sawyer, and could be run out of the east end of the building far enough to place logs on it as needed. As needed, a part of the crew would go out and skid a log on to the carriage by hand. This was generally done by the head and tail sawyers and setter, who would then re-

sume their positions and proceed to saw the log, the saw being idle in the meantime while they rolled the log on the carriage, properly placed it upon the head-blocks and firmly set the dogs which held it in place. The carriage frame, 14 feet long and 4 wide, had a platform fastened to and a part of it, upon which the setter stood at an iron lever controlling a mechanism by which he set the log to the saw for each board or piece cut. While the sawing was going on the simple operation of this lever for each cut as signaled by the head sawyer was the sole duty of the setter. There were three iron standards on the south side of the carriage which stood up about three' feet high, one near each end and one in the center, in connection with which iron dogs were operated in fastening a log on the carriage. The engineer's position and duties were at the engine in the west end of the building. Erwin Hyne, the head sawyer, stood on a stationary platform some four feet east and a little south of the saw, from where he operated the movements of the carriage back and forth with the lever. A small wheel called the divider was fastened to a roller 8 or 9 inches west of the saw, spreading the board being cut from the log. As the boards were sawed they were looked after by the tail sawyer who stood to the west and south of the saw where there were wooden rollers on a frame some lower than the carriage running to the west end of the building upon which the boards fell from the saw and along which they were moved away by the tail sawyer.

At the time Smith was killed an oak log 12 feet long and 12 or 14 inches in diameter had been placed upon the carriage and was being slabbed. The tail sawyer was just then taking a slab to the west end of the building. While the saw was passing through the log, cutting off a slab, Smith left his position on the platform as setter, got off the carriage at the west

end, went around to the position of the tail sawyer, where he pushed a just released slab which had fallen on the rollers towards the west. The carriage was then starting back to its position for another cut and in attempting to get back to his platform on the carriage which was on the opposite side of the saw from where he then was he fell over upon the saw and was killed. The only eyewitnesses to the accident were the head and tail sawyers.

The negligence complained of by the plaintiff is that the operations were not under a competent and experienced man, sufficient help was not employed, there being no person to carry away the slabs and lumber, and the tail sawyer was required or allowed to leave his station, deceased was not furnished a safe place in which to work, was permitted to cross the path of the carriage to remove slabs "and return to position while the carriage was in motion," and that "the head sawyer should have stopped the carriage when plaintiff's intestate was found to be in the position of the tail sawyer and knew he was about to return to his position on the carriage."

Defendant's principal contention is that his request for a directed verdict should have been granted because plaintiff's evidence does not *prima facie* make out any of the acts of negligence charged in the declaration; that the undisputed testimony shows that the mill was operated in a careful manner by experienced and competent men; and that the evidence conclusively shows that Smith's death resulted from his unanticipated, independent, negligent act in direct violation of instructions, and specific orders, for which defendant was in no manner responsible.

The operation of the mill was in charge of Erwin Hyne, a man 32 years of age, who had charge of fitting it out before it was started up and acted as head sawyer. He was an experienced man, familiar with the

various parts and appliances of the mill, duties of the employees in their various positions, had served as head sawyer eight or ten seasons, and testified: "The mill has never run more than three times in 18 years when I have not been on the job." Charles Standlick, the tail sawyer, testified that he had worked around sawmills quite considerable in other places and from the way Erwin operated the machine he "appeared to understand it and be careful and prudent. He operated it as good as anybody could operate a mill." A witness of defendant named Seymour Kellogg, who testified to over 15 years' experience in operating sawmills, testified he happened to be at the mill that spring the day before the accident, when Smith was the setter, and watched the sawing for perhaps two hours, that they were sawing all the time he was there, that the head sawyer controls the feed and Erwin used a slow speed, saying: "From my observation the first time I was there I would say Erwin appeared to be a competent and safe head sawyer. I know he was." We find no other testimony in this record by any witness touching the competency of Erwin, the man under whom the mill was being operated.

Plaintiff produced three witnesses with experience in sawmills to show the crew was insufficient for proper and safe operation of this mill. Will Palmerton, who testified to 30 years' experience in sawmills in various capacities, had seen this mill and thought it should have a crew of five, the shortage as he viewed it being the absence of a "slab rastler" to carry away the slabs, so that the tail sawyer, or "off bearer" as he expressed it, need not leave his position. He also offered the reflection that "in the proper operation of a mill there may be mills that have a thousand men and others that have only one or two." On cross-examination he said:

"There is no reason that I know of why that mill could not have been operated with perfect safety with four men if they had run it slowly enough so that Mr. Standlick could have got the lumber and slab all out of the way. It is simply a question of how fast you operate it. Two men could go out there and run that mill or three men with perfect safety if they run it slow enough."

Ralph Tubbs and Bailey Smith, called by plaintiff as experts, thought there should be one or more slab carriers at this mill because the tail sawyer should remain at his post, as otherwise a slab or other sawed piece might fly or be thrown or caught so as to do damage, a contingency which did not arise in this case. Both conceded that this mill could be run with a crew of four, if operated slow enough, with just as much safety as with more. There was in fact at this mill a fifth employee named Kennedy, caring for the lumber after it reached the west door, who assisted the tail sawyer when needed. Charles Standlick testified of this:

"I was able during that time to do that work and didn't need any assistance in doing it. There wasn't any room for anybody to assist me in there. Of course, as I said before, Mr. Kennedy helped me with some of the big heavy slabs after I got them to the door. There was no necessity for me to have another man out there. There couldn't another man work there with me as tail sawyer. I never saw the mill operated with two men acting as tail sawyers in that kind of a mill."

Defendant's testimony not only showed by men of equal experience that four men for the positions designated was a full crew for this mill as ordinarily run, but it was further shown undisputed that Erwin ran it on slow speed, and that at a later time Kellogg was head sawyer and he ran it with a crew of four men faster than Erwin had done, while Standlick as tail sawyer readily did his work without causing any delays.

The claim that deceased was not furnished a safe place in which to work would seem to be on the theory that the place in which his duties required him to work while the mill was in operation included positions of both setter and tail sawyer, of which there is no proof, while the undisputed evidence is directly to the contrary. His duties were at the log carriage and, when the mill was sawing, his position was upon the platform of the carriage back of the log being sawed, which was between him and the saw. His regular work there was to set the log by the simple mechanism on the carriage—to set it over and adjust it to proper position for each cut before the log started through, or towards, the saw, after which he customarily had no work and no duty but to stand by the log on his platform and watch until the carriage returned to its original position, where it stopped until he made another set as directed by the head sawyer. No element of unsafety is shown in the place furnished him to work beyond those ordinarily appertaining to the duties of a setter in such a mill. An experienced witness of defendant testified that the work of a setter, which was easily and quickly learned, must be done before the carriage is started through the log; that his platform is not dangerous to ride upon if he stands where he belongs and holds the lever, but "danger comes when they begin to shift from place to place and travel around the mill." The testimony is undisputed that Smith was fully instructed in this particular by Erwin, who cautioned him and emphasized the order with explanation on two or three occasions when he left his position, telling him not to do so any more. Charles Standlick testified: "I heard Erwin say, 'Mr. Smith, I want you to stay on that carrier.' * * * Erwin said that he wanted him to stay on the platform because it was dangerous for him to go back and forth." William Standlick, the engineer, testified:

"Erwin told Mr. Smith he wanted him to stay on the carriage. He told all of us to stay at our place."

Of the two men who saw the accident, Charles Standlick was called as a witness for plaintiff and Erwin Hyne for defendant. Standlick stated he thought they had been running the mill about half an hour when it happened. That as he went out at the west end with a slab, Smith was in his position on the carriage which was moving west, and as he returned Smith was in his (the tail sawyer's) place just putting a slab on the rollers which he rolled towards where witness stood. He thought the carriage had started back when he saw Smith "try to grab the carriage" with his left hand; that "he never touched it * * * he stepped on this roller and he slipped and the carriage was going back and the saw cut him right across the hip and took him over the saw." Asked if he meant the roller at the end of the tramway, he answered:

"Yes, and he made a grab for the iron onto the carrier, and he missed that and it throwed him right to the saw; he went over the saw, and I hollered— I guess they all heard me—and my brother jumped up on the platform. By the time I got around to where Mr. Smith laid my brother had the engine pretty nearly stopped."

On cross-examination he said:

"I thought from where I stood that 'as he started to grab for the carriage he stepped on the iron roller, but I could not be positive whether it was the iron roller or a wooden roller. I was about 10 feet from Mr. Smith when he grabbed for the carriage and stepped onto the roller. * * * I wouldn't think he got hold of it with his hand. I think he slipped on that roller and lost his balance, that is as near as I could tell. Then falling forward went onto the saw. As he stepped on the iron roller or some other part of the carrier or machinery there and reached for the carriage I wouldn't think he was two feet from the saw, if he was that. The saw was directly in front of the way he jumped, as he jumped forward. I took

it that the force he had himself given his body by stepping and reaching and the action of the carriage drew him directly onto the saw. That is the way it looked to me. He went so quickly it is pretty hard to tell."

On redirect-examination he further said:

"He started to grab hold of the post with his left hand and went onto the saw back first. I couldn't really tell whether he slipped with the roller over here on the carriage or this iron roller under motion. It was done so quickly, but I thought he was on the iron roller, and he might have been on the wooden roller. I couldn't say. Having in mind the way he turned and the fact his back went against the saw I couldn't tell which one he slipped on."

Of this accident Erwin Hyne testified:

"When Mr. Smith went around to the position of tail sawyer on that day, he got off the west end of the carriage and walked around while the saw was passing through the log, so that at the time it had got through he was around there. He took hold of the slab and as soon as the slab dropped off I started my carriage back. He started with the slab the other way. He moved the slab on these rollers from the east end of the saw where it dropped to the west end of this set of rollers and he was going that way, and the carriage started to go back. He moved this slab on the rollers at least eight feet. He was going that way and the carriage was going this way. I was watching my saw. My saw will rub a little bit on a stick and once in a while a little splinter fly, I was watching out looking right at the saw, and I saw Smith grabbing for the dog on the first head block to the west end and he stepped up on the iron roller. He did not catch the head block. It was too far back that way to the east, but stepped on that iron roller and with his quick motion lost his balance, swung around this way as his foot would throw him naturally over backwards, the saw caught his clothing, he flopped over in the saw as quick as that. The saw traveled around 450 to 500 revolutions a minute. If the saw was running 500 revolutions a minute it was 1/1000 part of a minute he was in passing over that

saw to the other side. The head block and dog which he reached for was near the saw because it was just out of his reach. It cut his clothes in the small of the back and he was whirled over and struck in a sitting position within two feet of me. I had reversed my carriage the minute I saw him making the jump. My carriage was stopped within three feet. A carriage moving with a log is heavy. I don't believe any man could stop one quicker. I stopped it as quickly as I could. At the time he grabbed for this standard on this carriage the east end of the carriage was about 14 feet east of the saw because the first head block was at the west side of the saw, or a little bit beyond, but it was just out of his reach. * * * The last time that I saw him before that he was pushing the slab on these rollers."

The undisputed testimony shows that Smith had, in violation of orders and while the head sawyer was occupied in controlling the returning carriage preparatory for another cut from the log, left his station and the appliance to which his duties related, passing by a safe way around the saw to a place and for a purpose out of the range and line of his employment; that when the cut was finished and the carriage started east to return past the saw for another cut he had started the other way (to the west) with the slab which had just been cut. He was then in a safe place going away from the saw. His next duty in the line of his employment was to make a set for the next cut, after the carriage had cleared the log 12 feet long, to the east of the saw and stopped. It would have taken him but the fraction of a minute to have walked that distance, and the first indication of his intent to do otherwise was his unsuccessful attempt to catch hold of the west standard, or dog of the head block on the carriage approaching the saw, on the opposite side from him for the indicated purpose of resuming his position on the carriage at the further side of the log which was also on the further side of the saw from him. In this attempt he stepped on a roller, which

he knew was there, lost his balance and fell against the saw with the sad result related. Standlick, plaintiff's witness, estimated that he was less than two feet from the saw directly in front of him when he stepped on the roller, reaching for the carriage, and lost his balance. Hyne said the iron roller was nine inches from the saw and estimated that "he must have been within two feet of the saw when he reached."

The case was submitted to the jury, which rendered a verdict for plaintiff in the sum of $1,990. The court charged the jury upon the circumstances of the accident as follows:

"And if you should find in this case that plaintiff's intestate was instructed to remain, by defendant's agents, in his place of duty on the platform attached to the carrier, being the setter's place of duty as appears from the evidence, and you should further find that he left that place and went to the place of tail sawyer, and while at the place of tail sawyer, in attempting to return to his place of duty while two feet from the saw he placed his foot upon an iron roller nine inches from the saw which he was facing, and tried to climb on the carrier then in motion and over a log thereon, he would as a matter of law, be guilty of wilful negligence, and should you find from the evidence that he did not follow his instructions to remain at his place of duty and did all of these other things I have mentioned at the time and place in question, and you should further find that such actions and conduct on the part of plaintiff's intestate was the cause of his death, then your verdict should be no cause of action."

If this instruction is a correct statement of the law in the case a verdict should have been directed for defendant as the record discloses all the contingent facts stated in the instruction established by undisputed testimony, not only that produced by defendant but in most particulars by the testimony of plaintiff's witness, Charles Standlick.

Defendant not having elected to come under the

workmen's compensation act, the common law defenses of assumption of risk, negligence of a fellow-servant and negligence of the injured employee, "unless and except it should appear such negligence was wilful," were not available to him (2 Comp. Laws 1915, § 5423). The trial court in submitting the question of wilful negligence instructed the jury as to such defense that the burden of proof was upon defendant to show Smith was guilty of willful negligence, and later, that if defendant or his employees were guilty of any of the acts of negligence charged in plaintiff's declaration which caused or contributed to the accident the latter was entitled to recover "even though you also find that the deceased himself failed to exercise due care."

Defendant contends with some force that the last instruction as given without qualification, and later in the charge than the instruction as to willful negligence, entirely eliminated that defense, as to which the court also erroneously put the burden of proof upon the defense against the settled rule of evidence in this State that in common-law, *ex delictu*, sections it is incumbent on the plaintiff to prove freedom from negligence, of any degree, causing or contributing to the accident, which is not changed by the law excusing him from all negligence not willful.

But back of those, and other questions argued, is the basic proposition that the kind or degree of the employee's negligence is of little moment in the absence of evidence of negligence on the part of defendant, as pointed out in *Lydman* v. *DeHaas*, 185 Mich. 128. In that important particular we are of the opinion plaintiff has failed to sustain the charges of negligence found in his declaration. The essential facts are practically undisputed. Amongst other evidence urged as raising an issue of fact for the jury, is that defendant's negligence is shown by the testimony of Palmerton, Tubbs, and Smith, who testified that in

their opinion proper and prudent operation of a saw-mill required the head sawyer to stop his carriage until the setter had returned to his place of duty or reached a place of safety. Smith was certainly in a place of perfect safety and not needed at his place of duty until the carriage was back east of the saw and stopped for a re-set of the log. He was headed and moving away from the saw when the head sawyer started the carriage back for a short distance to where it would stop; there was nothing to suggest the possibility of Smith's putting himself in a place of danger. These witnesses, and all other mill men who testified in the case, said that in their experience they never knew any person in a mill to attempt to catch a carriage moving towards the saw, and cross over it to the setter's position. Asked if he ever saw such a thing Palmerton said, "No," and that in his judgment no sensible man would take the chance. Tubbs said, "I never saw any one attempt to do that in 35 years. A man attempting to do that would take great chances." Smith said he had never seen it done while the saw was in motion, and he did not "think any prudent man would attempt such a feat." In view of such unanimous testimony by men of long experience it cannot be said under the circumstances shown in this case that it was negligence for the head sawyer not to anticipate it.

As was said by Justice MOORE in *Munn* v. *Telephone Co.*, 206 Mich. 201: The testimony "does not disclose actionable negligence on the part of defendant, but it does disclose an accident that nobody could or did anticipate." A verdict should have been directed for defendant.

The case is reversed without a new trial, with costs to defendant.

BIRD, C. J., and SHARPE, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.